UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:20-CR-326-MOC-DSC

| | |
|---|---|
| **UNITED STATES OF AMERICA**, ) | |
| ) | |
| ) | |
| Vs. ) | **ORDER** |
| ) | |
| **COREY GETON JOHNSON**, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**THIS MATTER** is before the Court on Defendant's Motion to Suppress. (Doc. No. 16). Having considered Defendant's motion, reviewed the pleadings, and conducted an evidentiary hearing, the Court enters the following findings, conclusions, and Order denying Defendant's motion.

**FINDINGS AND CONCLUSIONS**

### I. PROCEDURAL BACKGROUND

On October 11, 2011, this Court sentenced Defendant to 96 months in federal prison followed by five years of supervised release for his conviction for possessing a firearm during and in relation to a drug trafficking offense, in violation of 18 U.S.C. § 924(c). Defendant began supervised release on October 13, 2017. Defendant's supervised release included the Standard Conditions of Supervised Release as adopted in the Western District of North Carolina. Order Setting Standard Conditions of Probation and Supervised Release, NCWD (Dec. 8, 2016), https://www.ncwd.uscourts.gov/sites/default/files/general-orders/Standard%20Conditions%20Language%202016%20Order.pdf. In addition to other standard conditions, Defendant was ordered that he "shall not unlawfully purchase, possess, use,

1
Case 3:20-cr-00326-MOC-DSC   Document 23   Filed 07/28/21   Page 1 of 14

distribute or administer any narcotic or other controlled substance, or any paraphernalia related to such substances, except as duly prescribed by a licensed physician." (Doc. No. 25). Defendant was also ordered to "submit his person, residence . . . vehicle . . . or any electronic device capable of storing, retrieving, and/or accessing data to which they have access or control, to a search, from time to time, conducted by any U.S. Probation Officer and such other law enforcement personnel as the probation officer may deem advisable, *without a warrant*." (Id.) (emphasis added). Defendant was subject to "permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed by the probation officer." Id. Defendant acknowledged the conditions of his supervised release on October 16, 2017.

Based on the facts described below, on September 16, 2020, a grand jury returned a two-count indictment against Defendant for distribution of, and possession with the intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a) and 841(b)(1)(C) on January 23, 2020, and possession with the intent to distribute cocaine, cocaine base, and methamphetamine, in violation of 21 U.S.C. §§ 841(a), 841(b)(1)(B) and (b)(1)(C) on February 4, 2020. (Doc. No. 1).

## II. FACTUAL BACKGROUND

In January 2020, detectives with the Charlotte-Mecklenburg Police Department ("CMPD") were investigating Defendant for drug trafficking. CMPD Detective Jessica Frank, who had been posing in an undercover capacity, began communicating with Defendant and received a text message from the number she had for Defendant on January 23, 2020. Detective Frank and Defendant communicated through text messages and recorded phone calls and agreed that Defendant would sell a quantity of crack cocaine to Detective Frank. Detective Frank and Defendant agreed to meet that same day at the Graybar Building Supply located at 2500

2

Wilkinson Boulevard in Charlotte, North Carolina, within the Western District of North Carolina. Defendant arrived at the agreed-upon location in a green Toyota Camry bearing North Carolina license plate number FHE7539. Defendant provided Detective Frank with a baggie of a substance weighing 1.7 grams that was later analyzed and confirmed to be cocaine.

Officer Jessica Isaacs, a probation officer with the United States Probation Office ("USPO") who was assigned to supervise Defendant, learned of CMPD's investigation of Defendant's drug trafficking.

On February 4, 2020, officers with CMPD and USPO, including Officer Isaacs, met and discussed a plan to arrange a second drug transaction between undercover officer Detective Franks and Defendant.

CMPD officers began surveillance on Defendant's address that was listed with the USPO at 2700 Barringer Drive in Charlotte, North Carolina. Defendant was known to live in a detached building behind his mother's house.

An officer began conducting surveillance at Defendant's residence at 2:50 p.m. and observed Defendant exit the home with a black duffle bag in his arm. Defendant got into the driver's seat of a gray Toyota Camry bearing North Carolina license plate number FHE7539, drove away from the home, and returned around 3:00 p.m. USPO Officer Issacs was notified of Defendant's activity and responded by going to Defendant's home.

Five police officers and five probation officers, including Officer Issacs, arrived at Defendant's home a short time later, and USPO Officer Issacs and USPO Officer Jason Kemp knocked on the door of the detached building. Defendant answered the door and was detained in handcuffs by Officer Kemp, who informed Defendant that his search conditions were being invoked and provided him with <u>Miranda</u> warnings.

3

Case 3:20-cr-00326-MOC-DSC   Document 23   Filed 07/28/21   Page 3 of 14

USPO officers began searching Defendant's residence with the assistance of CMPD officers. CMPD Officer Peter Rangolan searched a bedroom and found several digital scales and bags of suspected narcotics, which were later analyzed and confirmed to be approximately 881 grams of crack cocaine, cocaine, and methamphetamine stuffed in various candy bags and hidden in shoes, all located in a makeshift closet area. Additional CMPD officers found two cell phones inside the home, and body armor in a trash can behind the home. USPO officer Gravely found a substance known as Inositol in a bedroom, which he recognized based on his training and experience as a cutting agent for making crack cocaine.

USPO Officers Issacs and Asa Gravely searched the Toyota Camry, and they found a BB gun in a backpack in the rear passenger seat, along with a candy bag containing $260 cash under the driver-side floormat.

USPO Officer Kemp and Officer Isaacs interviewed Defendant on the scene, and Defendant admitted to selling the drugs that were seized in the home and possessing the BB gun. A review of Defendant's cell phone by USPO Officer Kemp showed messages arranging drug sales.

On April 26, 2021, Defendant filed a Motion to Suppress. (Doc. No. 16). Defendant asks this Court to suppress all evidence derived from the search of Defendant's home on February 4, 2020, arguing that the warrantless search of his home did not comply with the reasonableness requirements of the Fourth Amendment. (See id. at 9). In making this argument, Defendant contends that the usual probable cause standard should apply to searches of those on supervised release ("supervisees") and their homes. (Id.). The Government asks this Court to hold that supervised release conditions authorizing warrantless searches of a supervisee's person, premises, or vehicle waive the Fourth Amendment's protections against warrantless searches.

(Doc. No. 19 at 5-7). The Government also appears to argue that the conditions of supervised release could make even suspicionless searches of supervisees' homes acceptable. (See id. at 7).

The Court finds the arguments of both parties unpersuasive and holds that a reasonable suspicion standard applies to the search in this case. Contrary to Defendant's claims, he did not have the same reasonable expectation of privacy in the items seized from his home on February 4, 2020 as would an ordinary citizen. Defendant did not object to conditions of supervised release that provided for warrantless searches of his person, premises, and vehicle. These conditions significantly lowered his privacy interest. Furthermore, Defendant's supervising probation officer was present and initiated a search of his residence pursuant to the standard conditions of supervised release, the search complied with Defendant's conditions of supervised release, and the search was based on reasonable suspicion. Thus, the totality of the circumstances establish that the search was reasonable under the Fourth Amendment.

### III. DISCUSSION

1. Fourth Amendment Protections and Federal Supervised Release

The government bears the burden of establishing a warrantless search of a home comports with the Fourth Amendment. See Welsh v. Wisconsin, 466 U.S. 740, 750 (1984) ("Before agents of the government may invade the sanctity of the home, the burden is on the government to demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries."). Today, the Court need not decide whether Defendant's failure to object to the search condition constituted a complete waiver of his Fourth Amendment rights relative to his supervised release because the Court concludes that the search of Defendant's home was based on reasonable suspicion. The existence of reasonable suspicion is important because the "Western District has revised its own 'standard'

5

Case 3:20-cr-00326-MOC-DSC    Document 23    Filed 07/28/21    Page 5 of 14

conditions" to require "any warrantless searches be 'based upon reasonable suspicion and/or [conducted] with the consent of the defendant." United States v. Boyd, No. 20-4054, 2021 WL 3074130, at *5, *n. 7 (4th Cir. July 21, 2021) (citing Misc. Order No. 3:21-MC-0003 (W.D.N.C. Jan. 11, 2021). Furthermore, the facts of this case make the warrantless search reasonable under the general Fourth Amendment approach of "examining the totality of the circumstances," Ohio v. Robinette, 519 U.S. 33, 39 (1996), with the supervised release condition being a salient circumstance.

The Fourth Amendment to the U.S. Constitution prohibits unreasonable searches and seizures. For there to be a "search," there must be an objective and subjective expectation of privacy in the place or item searched. Katz v. United States, 389 U.S. 347, 361 (1967) (Harlan, J., concurring). A search of one's home, as was done here, is among the most significant government intrusions protected by the Fourth Amendment. "[W]hen it comes to the Fourth Amendment, the home is first among equals." Florida v. Jardines, 569 U.S. 1, 6 (2013). Indeed, "[f]reedom from intrusion into the home or dwelling is the archetype of the privacy protection secured by the Fourth Amendment." Payton v. New York, 445 U.S. 573, 587 (1980) (quoting Dorman v. United States, 435 F.2d 385, 389 (D.C. Cir. 1970) (en banc)). "[A]t the very core of the Fourth Amendment stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." Payton, 445 U.S. at 589–90 (internal alterations, quotations and citation omitted). Accordingly, the home "deserve[s] the most scrupulous protection from government invasion." Oliver v. United States, 466 U.S. 170, 178 (1984) (citing Payton).

The touchstone of the Fourth Amendment is "reasonableness, and a search's reasonableness is determined by assessing, on the one hand, the degree to which it intrudes upon

6

an individual's privacy and, on the other, the degree to which it is needed to promote legitimate governmental interests." United States v. Knights, 534 U.S. 112, 118–19 (2001). Defendant's status as a person on supervised release ("supervisee") informs both sides of that balance.

Defendant's home was searched while he was on federal supervised release pursuant to a standard condition of supervised release. Although the Supreme Court has addressed the Fourth Amendment as applied to searches involving individuals on probation or parole, Samson v. California, 547 U.S. 843 (2006) (parole), United States v. Knights, 534 U.S. 112 (2001) (probation), it has never addressed the Fourth Amendment in the supervised release context.

The Supreme Court has, however, consistently upheld warrantless searches pursuant to a state's operation of its probation system. In Griffin v. Wisconsin, 483 U.S. 868, (1987), the Court held that the search was constitutional because it was conducted pursuant to a reasonable state regulation governing probationers. However, the Court expressly reserved judgment as to whether the search of a probationer's home for other purposes would be lawful if supported by reasonable grounds to believe contraband is present. Id. at 876.

In Knights, because the warrantless search of Knights's home by a law enforcement officer was "supported by reasonable suspicion and authorized by a condition of probation," it was held reasonable under the Fourth Amendment. Id. at 122. Notably, in Knights, the Court expressly declined to address whether the search condition's authorization of suspicionless searches by law enforcement officers violated the Fourth Amendment. Id. at 120 n.6 ("The terms of the probation condition permit [law enforcement searches without individualized suspicion], but we need not address the constitutionality of a suspicionless search because the search in this case was supported by reasonable suspicion.").

7

Samson v. California posed the question left unanswered by Knights—whether a warrantless search by a law enforcement officer without reasonable suspicion but authorized by conditions of supervision violates the Fourth Amendment. Samson, 547 U.S. 843, 849–50 (2006). The Samson Court approved of such suspicionless searches but limited its holding to parolee searches. Id. at 857.

"[T]he supervised release system's differences from probation and parole necessitate additional constitutional protections." United States v. Ka, 982 F.3d 219, 228 (4th Cir. 2020) (Gregory, C.J.) (dissenting). There is a "'continuum' of state-imposed punishments" with parolees having less privacy expectations than probationers. Samson, 547 U.S. at 850. "[P]arole is an established variation on imprisonment" as its "essence…is release from prison, before the completion of sentence…." Id. And probation is a "punishment[ ] for criminal convictions[,]" which like other punishments can reasonably deprive the offender of some freedoms enjoyed by law-abiding citizens. Knights, 534 U.S. at 119.

Supervised release, however, is a discretionary tool Congress authorized federal courts to use to "ease the defendant's transition into the community after the service of a long prison term for a particularly serious offense, or to provide rehabilitation to a defendant who has spent a fairly short period in prison for punishment or other purposes but still needs supervision and training programs after release." S. REP. 98-225, at *124. The unique nature of supervised release can be seen in the U.S. Code. "Authorized sentences" for a person found guilty of an offense are limited to "probation", "a fine" or "a term of imprisonment." 18 U.S.C. § 3551(a). And, "[a] prisoner shall be released by the Bureau of Prisons on the date of the expiration of the prisoner's term of imprisonment…." 18 U.S.C. § 3624(a). But a judge "may…include as a part of the sentence a requirement that the defendant be placed on a term of supervised release after

imprisonment…." 18 U.S.C. § 3583(a). Supervised release then does not seek to exact retribution on a person like probation, Tapia v. United States, 564 U.S. 319 (2011) (stating that "a court may not take account of retribution . . . when imposing a term of supervised release"), nor does it serve as part of an active prison term like parole.

Nevertheless, courts have made clear that supervisees do not receive the same Fourth Amendment protections as ordinary citizens. United States v. Winding, 817 F.3d 910, 916 (5th Cir. 2016). "Supervised release is akin to parole." Id. (quoting Johnson v. Owens, 612 Fed. Appx. 707, 711 (5th Cir. 2015). "[P]arolees enjoy even less of the average citizen's absolute liberty than do probationers." Samson, 547 U.S. 843, 850 (2006) (quoting United States v. Cardona, 903 F.2d 60, 63 (1st Cir. 1990)).

Furthermore, the Supreme Court has acknowledged the need for exceptions to the warrant and probable cause requirements of the Fourth Amendment where an administrative agency has "special needs, beyond the normal need for law enforcement." Griffin, 483 U.S. at 873 (internal quotation marks and citation omitted). The Supreme Court has held that "[a] state's operation of a probation system ... presents 'special needs' beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements." Id. at 873–74. The Court noted that the restrictions associated with probation are "meant to assure that the probation serves as a period of genuine rehabilitation and that the community is not harmed by the probationer's being at large." Id. at 875. Accordingly, the Court concluded that "[t]hese same goals require and justify the exercise of supervision to assure that the restrictions are in fact observed." Id. at 875. Supervision is "a 'special need' of the State permitting a degree of impingement upon privacy that would not be constitutional if applied to the public at large." Id.

"These principles apply *a fortiori* to federal supervised release, which, in contrast to probation, is 'meted out in addition to, not in lieu of, incarceration.'" United States v. Reyes, 283 F.3d 446, 461 (2d Cir. 2002) (quoting Cardona, 903 F.2d at 63). "A convicted person serving a term of supervised release must comply with certain conditions, enforced by federal probation officers, or face further penal sanctions." Id. The "'overwhelming interest' in ensuring that a parolee complies with [parole] requirements and is returned to prison if he fails to do so," Pa. Bd. of Prob. & Parole v. Scott, 524 U.S. 357, 369 (1998), also exists in full measure with respect to a convicted person serving a term of federal supervised release. See Reyes, 283 F.3d at 458. As a result, "the probable cause requirements of the Fourth Amendment, which apply to a regular law enforcement officer executing a search warrant for an individual's home, simply do not apply to visits by probation officers to the homes of convicted persons serving a term of supervised release." Id. (citations omitted).

In short, individuals on supervised release do not enjoy the full protections of the Fourth Amendment and probation officers are not required to have probable cause or a warrant to search the home of a supervisee. However, supervisees are protected from random searches of their homes. Today, this Could holds that the balance of the above considerations requires no more than reasonable suspicion to conduct a search of a supervisee's residence or vehicle. This decision is also in alignment with the Western District's recent modification to its standard supervised release conditions that now requires reasonable suspicion to conduct warrantless searches. See Boyd, 2021 WL 3074130, at *5, *n. 7. The degree of individualized suspicion required of a search is "a determination of when there is a sufficiently high probability that criminal conduct is occurring to make the intrusion on the individual's privacy interest reasonable." See United States v. Cortez, 449 U.S. 411, 418 (individualized suspicion deals

"with probabilities"). Although the Fourth Amendment ordinarily requires the degree of probability embodied in the term "probable cause," a lesser degree satisfies the Constitution when the balance of governmental and private interests makes such a standard reasonable. See, e.g., Terry v. Ohio, 392 U.S. 1 (1968); United States v. Brignoni-Ponce, 422 U.S. 873 (1975). Those interests warrant a lesser than probable-cause standard here. When a probation officer and law enforcement have reasonable suspicion that a supervisee subject to a home search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the supervisee's significantly diminished privacy interests is reasonable.

Furthermore, it is important to note, given the facts of this case, that while regular law enforcement officers are not empowered to conduct the visits that probation officers are required to make to the homes of convicted persons serving federal terms of supervised release, "it is entirely appropriate for law enforcement officers providing support for a home visit 'to be on the scene'—a role that is 'predicated upon the probation officers' more limited law enforcement authority.'" Reyes, 283 F.3d at 469–70 (quoting David N. Adair, Jr., Probation Officer Searches, 62 FED. PROBATION 68, 71 (June 1998)). Accordingly, it seems likely that regular law enforcement officers, such as local or state police or other federal agents, may be called upon to seize the drugs in the place of the probation officers who, as a matter of prudence and as a matter of policy, refrain from seizing the evidence themselves—though they are fully empowered to do so under the law—and instead consign their seizure authority to law enforcement officers at the scene by notifying them of the likely presence of drugs. See Reyes, 283 F. 3d at 470. Simply stated, "there is nothing improper about a probation officer adopting a more modest or cautious approach to seizures than is actually permitted by law—one that permits probation officers to

rely on law enforcement officers to take hold of the contraband or, indeed, to arrest the person under supervision." Id.

2. Reasonable Suspicion to Search Home

Reasonable suspicion requires "a particularized and objective basis for suspecting the person [searched] of criminal activity." Ornelas v. United States, 517 U.S. 690, 696 (1996). It is "a less demanding standard than probable cause and requires a showing considerably less demanding than preponderance of the evidence." Illinois v. Wardlow, 528 U.S. 119, 123 (2000). Reasonable suspicion is now required in the Western District for warrantless searches of those on supervised release. Boyd, 2021 WL 3074130, at *5, *n. 7

Courts have consistently upheld searches based on reasonable suspicion in the probationary context. United States v. Plemmons, 770 F. App'x 650, 652 (4th Cir. 2019). In Plemmons, Plemmons's probation officer received a tip from a fellow law enforcement officer roughly seven weeks before the search. Id. at 652. The tip revealed that a suspect housed at a county jail admitted to selling methamphetamine for Plemmons. Id. The Fourth Circuit held that this in-person statement against penal interest provided the probation officer with a sufficiently reliable basis to suspect Plemmons of possessing methamphetamine. Id.; See United States v. Lawing, 703 F.3d 229, 236 (4th Cir. 2012). The court further concluded that the time that elapsed between the tip and the search did not appreciably diminish the tip's reliability, especially since the conduct alleged—methamphetamine trafficking—is not the type of isolated crime that directly implicates staleness concerns. Plemmons, 770 F. App'x at 652; see United States v. Farmer, 370 F.3d 435, 438-39 (4th Cir. 2004). Thus, to the extent it could be considered necessary, reasonable suspicion supported the probation officer's decision to search Plemmons' residence. Id.

Similarly, there was reasonable suspicion to validate the search in this case. First, Defendant was fully aware that the conditions of his supervision included submission to searches of "his person, residence . . . vehicle . . . or any electronic device . . . without a warrant"—as demonstrated by his acknowledgment of his supervised release conditions on October 16, 2017. As such, he had a severely diminished expectation of privacy with respect to any home visit by a probation officer.

Second, law enforcement officers directly observed Defendant engaging in drug trafficking activity less than two weeks before the search. Third, a law enforcement officer spoke directly with Defendant to arrange a drug deal and met with Defendant in person to purchase a quantity of cocaine. Fourth, the less than two weeks that elapsed between this drug sale and the search of Defendant's residence did not create staleness, especially as drug trafficking is not the type of crime that directly implicates staleness concerns. See Farmer, 370 F. 3d at 438–39. Fifth, immediately before the search, officers observed Defendant exit his known residence and leave in the same vehicle that was used to conduct the undercover drug sale less than two weeks earlier. Sixth, with his probation officer being aware that he had engaged in distribution activities less than two weeks prior to the search, it was well within an inquiry of reasonableness for the probation officer to initiate a search based on the reasonable suspicion of continued drug activity in Defendant's home. Seventh, it was reasonable for the probation officer to rely on law enforcement in the search and seizure of the drugs. See, e.g., Reyes, 283 F.3d at 470.

### IV.     CONCLUSION

For the reasons stated herein, the Court holds that the standard of review that applies to searches of supervisees—including their homes, effects, and persons—is one of reasonable suspicion. Here, the probation officer had reasonable suspicion to justify a search of Defendant's

13
Case 3:20-cr-00326-MOC-DSC   Document 23   Filed 07/28/21   Page 13 of 14

residence, vehicle, and phone. As such, this search does not run afoul of the Fourth Amendment, and the Court denies Defendant's Motion to Suppress.

## ORDER

**IT IS, THEREFORE, ORDERED** that Defendant's Motion to Suppress, (Doc. No. 16), is **DENIED**.

Signed: July 27, 2021

Max O. Cogburn Jr.
United States District Judge